## LITTLE et al. v. HERZINGER et al.

No. 1930. Decided August 14, 1908 (97 Pac. 639).

1. APPEAL AND ERROR—FINDINGS—REVIEW. The court on appeal in an action at law cannot weigh the evidence to determine its sufficiency.

2. SAME. The court on appeal in an action at law, where the facts are undisputed, and the inferences deducible therefrom leave no room for reasonable doubt, will determine the questions of law governing when applied to such facts.

3. BROKERS—EMPLOYMENT TO PROCURE PURCHASER—COMMISSIONS WHEN EARNED. A broker employed to procure a purchaser, who produces a purchaser ready, able, and willing to purchase on the terms imposed by the owner and to pay the price demanded, is entitled to his commissions.

34 Utah—22

4. SAME—EVIDENCE—ADMISSIBILITY. While the acts of a purchaser procured by a broker employed to obtain a purchaser subsequent to the time fixed for the performance of the contract cannot affect the rights of the broker to his commission, such acts may be looked to, to determine whether what the purchaser did to establish the broker's rights was done in good faith, and whether such prior acts had the legal effect claimed for them.

5. PRINCIPAL AND AGENT—TRANSACTIONS BETWEEN PRINCIPAL AND AGENT. As between principal and agent, the utmost good faith is required on the part of both; and, where the agent fails to keep the principal informed of all the facts, he cannot obtain any advantage by reason of his own negligence or want of good faith.

6. BROKERS—EMPLOYMENT TO PROCURE PURCHASER—COMMISSIONS— WHEN EARNED. A broker obtained a customer who contracted for the purchase of the property. Before the time fixed for performance, the purchaser failed to obtain an extension of time asked for, because of his inability to procure funds. The purchaser, on ascertaining that the broker did not have the deed in his possession on the day fixed for performance, tendered the price, and demanded the deed. The purchaser induced a bank to make the tender with the understanding that the identical money would be returned. The tender was made by the bank's clerks. The purchaser, on being subsequently given an opportunity to purchase on the same terms, refused to do so, though the property was worth more than the agreed price. *Held* to show, as a matter of law, that the purchaser was not able and ready to comply with the terms of his agreement, defeating a recovery by the broker of his commissions.

APPEAL from District Court, Third District; M. L. Ritchie, Judge.

Action by F. W. Little and another, copartners, doing business as Little & Little, against Agnes G. Herzinger and others. From a judgment for plaintiffs, defendants appeal.

REVERSED AND REMANDED.

*Dickson, Ellis, Ellis & Schulder* for appellants.

*Stevens, Smith & Porter* for respondents.

FRICK, J.

The respondents commenced this action in the district court of Salt Lake county to recover a commission alleged to have been earned by them in making a sale of real estate as the agents of appellants. Respondents are partners engaged in the real estate business in Salt Lake City, and appellants are nonresidents of this state, and during all of the time covered by the transaction referred to herein were absent therefrom.

The undisputed facts developed at the trial are substantially as follows: Appellants owned a certain parcel of real estate located in the business district of Salt Lake City, which they had listed with respondents for sale and to be sold by them. After some preliminary correspondence between respondents and appellants with respect to the terms and conditions of sale, respondents, pursuant to such correspondence, on the 30th day of December, 1905, prepared an option agreement, which was duly executed by all the parties, and in which appellants were styled "first parties" and one W. S. Crismon, the purchaser, "second party." The stipulations of this agreement, so far as material here, are as follows: "Said first parties further agree: (1) Within fifteen days after said date, to furnish to date and tender to said second party a complete abstract of said premises. (2) That said second party may have until May 1, 1906, to examine the said abstract; and if the title is marketable, and the second party elects not to buy, then said receipted sum is forfeited; if the title is not marketable, then said receipted sum to be returned. (3) To tender to said second party a deed as above specified on May 1, 1906, or sooner if demanded. (4) If said title is not marketable then to make it so on demand, if the second party binds himself to buy. (5) To accept payment (if said second party buys) of said balance of the purchase price, as follows, to wit: Fourteen thousand five hundred ($14,500.00) in current funds of the United States. Demand and tender to be made at the office of Little and Little." The agreement was executed in duplicate; one copy being forwarded to Mrs. Agnes Herzinger, who lived in San Francisco, and the other delivered to the purchaser. The

$500 mentioned in the agreement was duly paid by Mr.
Crismon and received by the appellant Mrs. Herzinger. Fred
H. Herzinger, a son of Mrs. Herzinger, lived in Ouray,
Colorado. Nothing further seems to have been done in the
matter until April 11, 1906, when the appellant Fred H.
Herzinger wrote the following letter to respondents, to wit:
"Gentlemen: I am writing to ascertain whether or not the
party is going to complete the purchase of the Herzinger
corner, 3d South and 2nd East. If so, we should be getting
a deed ready, as my recollection of the matter is that we have
not made one yet, and this purchase is to be completed on
May 1st. What is your commission to be? and how will we
arrange this payment? or purchase money to be paid? I
can either come out to Salt Lake, or I suppose the deed put
in escrow in some reliable bank in Salt Lake will be satisfac-
tory. Hoping to receive an early reply, I am," etc. This
letter never was answered by respondents, but on or about
the 10th day of April, 1906, they wrote the following letter
to Mrs. Agnes Herzinger: "Dear Madam: The party who
bought the corner has had some disappointment in money
matters, and wanted us to write you for an extension of time,
to make the final payment to July 6, 1906, at which time he
will have the money. Customers for this class of property
are very scarce, and we have no doubt, if you extend the time,
we can nurse him along and get the money on July 6, 1906.
We advise the extension, as this is the most expeditious way
of selling, and, of course, he will have to pay the paving tax
if levied this year which may be, as they are paving a good
many streets just now. We are anxious to get the matter
closed for your sake as well as ours, and think this the wisest
move. If agreeable to you, please sign the enclosed, and
forward for the other signatures and return to us." Mrs.
Herzinger on the 13th of April, 1906, replied to this letter as
follows: "Dear Sirs: Your letter has been received, and
I will forward it at once to my son at Ouray, Colorado, ask-
ing him to answer you direct. As your buyer asks for more
than two months extension of time, I think it is only fair that
he should be willing to make some return for the favor he

asks. Of course, I can't say what my son will do, but my daughters and I make you the following offer: That we will extend the time as he desires till July 6, 1906, providing he will .pay us on the 1st of May the sum of five hundred dollars ($500.00), this to be in addition to the $14.500 specified in the contract." On April 16th respondents also wrote the following letter to Fred H. Herzinger: "Dear Sir: We wrote your mother some time ago about granting an extension to make next payment on corner to July 6, 1906, as the buyer has been delayed in getting his money, but says he will be ready to pay on or before the above mentioned date. As the market is quiet at present, we think the surest and quickest way to a sale is to grant the extension, and we strongly advise it. Kindly let us hear from you as soon as possible." Fred H. Herzinger on April 16th wrote a letter to respondents in which he agrees to the terms proposed by his mother. Respondents did not answer either the letter of Mrs. Herzinger or that of her son containing the proposition, and they had no information with regard to what was being done by the respondents or the purchaser with regard to the proposition for an extension of time. Fred H. Herzinger, having received no answer to his letter of inquiry of April 11, 1906, prepared no deed nor forwarded any for delivery, as provided in the option agreement. Mr. Crismon, after having ascertained from respondents that no deed had been received by them, on the afternoon of May 1, 1906, made a pretended tender of the $14,500 named in the agreement to respondents at their office. The manner in which this tender was made will be more particularly referred to hereafter. Following this tender, on May 2, 1906, respondents wrote to Mrs. Herzinger the following letter: "Dear Madam: Since your refusal to extend the time to July 6, 1906, on the option on the corner, we have been expecting to receive a deed from you daily. Mr. Fred H. Herzinger in his letter of April 11th mentioned the deed question. We could not get the buyer to pay $500 additional for the extension, and on May 1st, at about bank closing time, he tendered to us $14,-500.00 in gold coin and demanded the deed, which, of course,

we did not have to give him. This is as far as the matter has gone up to date. Will keep you advised in the future. We told the buyer we expected the deed daily and asked him if we should send and get it. He replied: 'Do as you like.' Perhaps you had better send the deed so that it can be tendered to him, if it is not now on the way." On May 7, 1906, Mr. Crismon addressed the following letter to respondents: "Gentlemen: In compliance with my contract for the purchase of the Herzinger corner, a part of lot eight, block forty-two plat 'A,' Salt Lake City survey, on May 1, 1906, at twelve minutes to three o'clock p. m., I tendered to you fourteen thousand and five hundred dollars in gold coin which was then counted by Mr. Jesse C. Little of your firm. I then demanded a deed to said property which you were unable to furnish. I now demand the return of the five hundred dollars paid by me on said property." On May 17, 1906, Fred H. Herzinger wrote the following letter to respondents: "Gentlemen: I am just in receipt of a letter from my mother saying that you had informed her that Mr. W. S. Crismon had tendered the final payment due the 1st of May on our corner (2d South and 2nd East) on the above date May 1st, and that there was no deed there. Well, now, as a matter of fact, you wrote that Mr. Crismon had been disappointed in money matters, and could not make the payment at that time, and asked to have the payment deferred to July 6, 1906, which we said we would do under certain conditions. Consequently it was not deemed necessary to furnish the deed on May 1st. However, if Mr. Crismon still wants that property, and is ready to make the payment which was due on May 1st and is ready to close the deal immediately, I am ready to leave for Salt Lake and fix the matter up with him, as I have the deed from my mother and sisters properly executed and in my possession, and it needs nothing more but my signature. So you see Mr. Crismon, and inform him what can be done, and, if he is ready to make the other payment, either wire or write me, and I will leave for your city at once and close same with him completely, pay you your commission, and settle the whole matter. Of course, this is

not a standing offer, and, if he wants it, he must act immediately." On May 18, 1906, respondents replied to the foregoing letter as follows: "Dear Sir: Yours of the 17th inst. at hand, and in reply will say that we hardly think that Mr. Crismon will take the deed up at the present time. He says that after he could not get an extension without paying more money, he arranged to pay the money due on May 1, 1906, and made a tender of the money, but the deed not being here we could not accept it, and he is not now prepared to close the deal. We regret for your sake and ours, too, that matters have taken the turn they have, for you lost the sale and we lost the commission. He made a formal demand upon us for the return of the $500, and, as he lived up to his contract and you did not on account of not having the deed here, we think there is no question but that he can recover the $500 paid you. Talking with him to-day, he said he would pay an additional $500, and the $14,000 remaining due in one year. The market is slow, and, as this is in effect a payment of $1,000 and practically insures a sale within the year, we would like to see you accept it. You have held the corner for a great many years and have done nothing with it, and in this way you are getting some action on it, and will probably get all the cash before the year is up." To this letter Fred H. Herzinger replied on May 19, 1906, in which, after refusing Mr. Crismon's demand for the $500 and giving his reasons therefor, he says: "My offer of a few days ago to still give him the chance to get the property upon the payment of $14,500 provided he acted at once certainly shows that we are willing to do the square thing, and it seems queer that a short time before the payment was due he didn't have the money, then when it was due, and he knew the deed wasn't there, that he did have the money, and now, when I still give him the chance of getting the property at the original price, he hasn't the money again. Now, my folks have turned this matter over to me, and I wish to say and to be understood that I will never consent to the returning of the $500, and you had better show this letter to Mr. Crismon, so that he will fully understand the situation." On May 25, 1906, respond-

ents again wrote to Mr. Herzinger. After stating that they showed Mr. Herzinger's last letter to Mr. Crismon, and that he contended that he had "kept his part of the contract," the letter proceeds as follows: "He says now that to show that he means business will pay you $2,000 (which will include the $500 already paid) down, and the balance in one year upon the same kind of a contract as before, and will pay the taxes for 1906 when they become due. At the end of the year, he would rather have you take a mortgage on the property for $8,000, due in two years from then, at six per cent. interest, and pay cash balance at that time of $5,000, but will take it in the former way if you prefer. As regards our com·mission, if you accept this proposition, of course, we would like part or all of it when he pays the $1,500 cash, but, if you object to this, we will wait till the end of the year. We think you should accept this offer, and would like a reply at once, and, if satisfactory, will make up contracts and forward for signature. You must have the original contract as it was sent to you or Mrs. Herzinger at the time the deal was closed." To this letter Mr. Herzinger replied by letter dated May 28, 1906, in which, after referring to the value of the property, he says "I will make Mr. Crismon this proposition, though: I will tie the property up to him till May 1, 1907, at $17,500, he to pay $2,500 down at the present time, of which we will say he has already paid $500, leaving the balance of $2,000 more to pay. He to pay the taxes for 1906 and to pay six per cent. interest on the other $15,000, and, of course, he is to have the privilege of paying the $15,-000 and interest and taking his deed any time between the present and May 1, 1907. If Mr. Crismon borrowed the money to make that payment of $14,500 on May 1st, and it was all in good faith, why can he not do the same again? And I will still give him the deed upon that payment, if he so desires. So he has two propositions from me now, and they are the best I can do. But these are not standing offers, and, if he wishes to take up either, he must let me know at once before I get a deal started with some one else." On May 29, 1906, respondents again wrote him as follows: "Dear

Sir: Yours of the 28th inst. received, and in reply will say: We are surprised that you are not willing to accept Mr. Crismon's offer. Don't think just because other agents have written you that you could find a ready sale at $15,000, for you could not. They just want the property for sale, not knowing what they can do. Don't you think, Mr. Herzinger, that if other agents had a customer for this property that they would come to us? As they all know that we have it. Perhaps you should advise your mother of the offer, as she might look at it in a different way and be very glad indeed to do business, as it is an awfully good proposition he has made you. Mr. Crismon had his contract placed on record some days before May 1, 1906. You had better reconsider this matter and close up with him." To this letter Mr. Herzinger, on June 9, 1906, replied as follows: "Gentlemen: I submitted Mr. Crismon's proposition contained in your letter of recent date to my mother, and she refuses to accept same. I also told her of the propositions I had made Mr. Crismon through you and she will accept either of these, and, should he want to take up either, we will allow him until July, 1906, to close same; and, if the deal is not consummated by that date, we will withdraw the property from the market altogether. The propositions to Mr. Crismon are $14,500 cash for the property. Or $2,000 cash and $15,000 May 1, 1907, the $15,000 bearing interest at the rate of 6 per cent. per annum, and he to pay the taxes in either event for the year 1906. To any one except Mr. Crismon the cash payment down is $500 more in either event, other conditions the same as in Mr. Crismon's propositions. Should you not be able to make the deal at all, please return to me the abstract of title, and oblige.'' This seems to have ended the communication between the parties with regard to the transaction referred to in the correspondence.

Referring now to the alleged tender of Mr. Crismon, the undisputed evidence is, in substance, as follows: Mr. Louis H. Farnsworth, the assistant cashier of Walker Brothers' Bank, testified that Mr. Crismon came to the bank on May 1, 1906, and made arrangements with the witness to obtain the

sum of $14,500. On direct examination of this witness by appellant's counsel, questions were asked and answered as follows: "Q. You may state what, if anything, he [Crismon] said at the time he applied for the money as to whether it would be returned immediately or not. A. My recollection is that he arranged with me for this money for the purpose of making a tender for a piece of property, and told me that the money would be refunded—would be returned. The money was sent over at his request. Q. That is, told you it would be returned immediately? A. I so understood, that it would come back that same day." The evidence further shows that, in pursuance of this arrangement, Mr. Farnsworth did not deliver the money to Mr. Crismon, but that two of the bank clerks were directed to take, and did take, the $14,500 in gold coin across the street from the bank to the office of respondents, and there tendered it to them, and after respondents, or one of them, had counted it, it was by the same clerks, who remained with the money all the time, taken back to the bank; that the clerks simply followed directions, knew nothing about the transaction, but simply carried the money across the street to respondents' office, and after it was counted took it back to the bank. Neither of them could tell whether any record of the transaction was made in the bank's books, nor is there any evidence by any one that any record was made of the transaction, except what may be inferred from what Mr. Farnsworth said; and from what he said the inference is most strong that no record was ever intended to be made. Mr. Farnsworth further testified that the transaction was evidenced by Mr. Crismon's check, but he also said that this check was returned to him when the money was returned by the clerks. It further appeared that Mr. Crismon inquired of respondents in the forenoon of May 1, 1906, whether they had received the deed or not from appellants, and they informed him that they had not. It also appeared from the testimony of respondents that between the time the option agreement was entered into and the 1st of May, 1906, when it matured, they had made attempts to sell the parcel of land for Mr. Crismon, but could not obtain the price they

asked therefor.   Mr. Fred H. Herzinger also testified that
the reason why the deed was not forwarded to respondents
so as to be in their possession on May 1, 1906, was because
he construed their letters to mean that Mr. Crismon would
not make the payment at that time.

Upon substantially the foregoing evidence, the court made
findings of fact and conclusions of law in favor of respond-
ents, and rendered judgment in their favor for the amount
claimed by them.   The assignments of error attack the find-
ings upon the ground that there is no evidence to sustain
them, and assail the conclusions of law upon the ground that
they are contrary to both the law and the evidence.

Respondents assert that, under the decisions of this court,
there is nothing for us to pass upon in this case; that the
only questions involved are questions of fact, and, this being
a law case, we cannot review the evidence to determine its
weight and sufficiency; that all that we have the power to do
is to determine whether there is any legal or competent
evidence in the record in support of the findings of fact; that
there is such evidence, and hence the judgment should be af-
firmed.   This court has repeatedly held that in law cases we
cannot pass upon the weight of the evidence, and in that way
determine its sufficiency, nor can we, in case of conflicting
statements, or in case where there is reasonable ground for
difference with regard to the inferences that may be de-
duced from certain facts or statements, determine upon which
side the evidence preponderates.   But this court has never
held that, where the facts are undisputed and the inferences
to be deduced from them leave no room for reasonable doubt
with regard to their legal effect, it will not pass upon and
determine the questions of law that must govern and control
when applied to the undisputed facts.

We have set forth the evidence at considerable length, and
we think we have stated all of it that can in any way in-
fluence the result; and from this evidence we have been
forced to arrive at a conclusion of law diametrically opposite
to that reached by the trial court.   It is true the court, in
effect, found that respondents had agreed to find a purchaser

for appellants' property; that respondents had found one who was ready, able, and willing to purchase the property for the price asked and upon the terms and conditions imposed; and that both respondents and the purchaser had respectively ·performed the conditions assumed by them, while appellants had failed in the fulfillment of their part so far as the same applied to the tender of a deed. If the evidence upon the matters involved in the foregoing statement, or upon any one of them, were conflicting, or if there were any substantial difference in the contentions of the parties with regard to whether certain testimony was true or false, then, in case there was any substantial evidence in support of the findings, we would be powerless to interfere with the conclusions reached by the trial court. But in this case there is absolutely no conflict nor is there any claim that any part of the evidence material to the issue is untrue. There is nothing for the court to do, therefore, but to apply the law to the undisputed facts. In one sense, no doubt, the ultimate facts upon which the judgment rests must be found from the evidence by the court. Where, however, the facts are clear and undisputed, the principle involved in determining their legal effect is precisely the same as it would be in case of an agreed statement of facts. No one would seriously contend that the legal effect to be given to the facts or result of a case could be affected by recasting the agreed statement of facts into a different form in the findings made by the court. The only question for the court would be to apply the law to the facts not disputed in the one instance and as agreed to in the other.

Applying these rules of law to this case, the questions whether respondents produced a purchaser who was able, ready, and willing to purchase appellants' property upon the terms and conditions imposed by them, and to pay therefor at the time specified, must be deduced from the undisputed evidence in the record. That an option agreement was duly entered into and what its terms and conditions are is clear. That there was an application for an extension of time by the purchaser to make the final payment is also clear. The legal

effect of the correspondence with regard to this no one can misunderstand. That no conclusion upon the proposition for an extension of time and the counter proposition on the part of appellants was ever arrived at is beyond dispute. That the purchaser took advantage of appellants' nonaction in not forwarding the deed by May 1, 1906, and that they did not forward the deed for the reason that the purchaser asked for an extension of time on the ground that he was disappointed in money matters, admits of no argument. Whether this advantage was intentional or otherwise is entirely immaterial in this case. That the alleged tender made on May 1, 1906, was colorable merely in the light of all the evidence, admits of no dispute. That appellants, when they learned that the purchaser claimed that he had fulfilled his part of the contract, were able, ready, and willing to fulfill their part, is not and cannot be controverted. The whole question, therefore, is: Had the respondents earned their commission as a matter of law? If they produced a purchaser who was ready, able, and willing to purchase the property upon the terms and conditions imposed by the appellants and to pay the price demanded by them therefor, respondents are entitled to recover. We are convinced from the undisputed facts that respondents did not do this. Before the purchaser made the pretended tender, he was careful to ascertain whether the deed was in the hands of respondents for delivery or not. If the conditions had been such that he was required to have the money only in case a deed was not in the hands of respondents for delivery, there might be some justification for his conduct, but he was required to make payment for the land in case the deed was ready for delivery, and he wanted it, but there is not the slightest evidence in the record that he either had the money, or that he made any provision for it so that he might make this payment. In the face of his statement that he was disappointed in money matters and wanted an extension of time to obtain the money, it cannot be presumed that he had the money on the 1st of May when the pretended tender was made. The transaction with the bank whereby the $14,500 was obtained to make the tender was so

clearly a matter of form merely that it hardly requires discussion. The money never was delivered to Mr. Crismon or to any one acting for him, and he never had possession of it. The money always was under the control, if not in the actual possession, of the bank clerks who acted for the bank, and thus constructively in the possession of the bank. Surely it cannot be claimed that, while respondents or one of them counted it, it was constructively in Mr. Crismon's possession. Respondents were not his agents, but were the agents of and represented the appellants. What respondents did, therefore, was simply to count the bank's money. The money was sent over by the bank, not as a loan to Mr. Crismon, but for the effect a tender might have, and the identical money was to be returned at once. Respondents might just as well have gone to the bank and with its permission entered one of its vaults and counted $14,500 of the bank's money. The legal effect would have been precisely the same. Moreover, respondents and Mr. Crismon knew that the deed was not in respondents' hands; that they had asked for an extension of time for Mr. Crismon in which to make the final payment; that the proposal made by them in his behalf had been refused and a counter proposition had been made; that these propositions were then pending; that Fred H. Herzinger had made timely inquiry as to whether the final payment would probably be made so that a deed might be prepared; that no answer had ever been given him, except it be said that the request for more time was an answer, and, if this be held an answer, then respondents and Mr. Crismon either knew or had good reason to believe that appellants had probably been misled by the pending propositions. In the light of all of these facts, respondents, as the agents and representatives of appellants, ought to have spurned Mr. Crismon's tender, and, instead of counting the bank's money, they should have reminded him of the true state of affairs, and informed him that he, and not their clients, was in fault. There was entirely too much ceremony and circumstantiality in making this tender. There was too much care exercised in its execution to leave it without suspicion. Moreover, the reiteration of the details with

regard to it by Mr. Crismon in his letter to respondents only a few days later again shows that somehow they all were afraid that some one might question this tender. The whole affair impresses us, and it seems to us must so impress all, that this tender was a mere matter of form. When this tender is viewed in the light of all the circumstances, it would be a reproach to the law to permit a transaction so transparent to pass as current coin or to give it any legal effect whatever. Mr. Crismon is not called as a witness. No explanation of his conduct is even attempted, and respondents are willing to rest their rights upon the naked transaction as detailed in the evidence. In this regard Mr. Crismon's lack of good faith is so apparent from his subsequent acts and conduct that reasonable men cannot differ in their conclusions with regard thereto. When he was given the opportunity to obtain the property on practically, if not precisely, the same terms and conditions as stated by himself in his request for an extension of time, he refused to take it, although the undisputed evidence is that the property was then worth more than the amount he agreed to pay for it. That his subsequent acts cannot affect his nor respondents' legal rights, if they had any, as they existed on May 1, 1906, is conceded. But his subsequent acts and conduct may be looked to for the purpose of determining whether what he had done to establish these alleged rights was done in good faith, and whether such prior acts had the legal effect claimed for them. Again, in determining respondent's rights, we must not overlook the fact that, as between principal and agent, the utmost good faith is required on the part of both. While a stranger may hold the principal liable for the acts of his authorized agent, although the principal may not have been thoroughly informed with regard to the facts by the agent, that is not the law with respect to rights as between principal and agent. It is the agent's duty to keep the principal fully informed of all the facts and circumstances, and, if the agent fails to do this, the law will not permit him to obtain any advantage by reason of his own negligence or want of absolute good faith. It is no answer in this case that appellants knew of the condi-

tions of the option agreement as well as respondents did. The agreement was a mere option. Mr. Crismon was not bound to make payment, unless he chose to do so. It was only fair, therefore, that when Mr. Herzinger inquired of respondents whether the payment would probably be made at the specified time, and whether the deed was required to be on hand, they at once and fully answer his inquiry. Instead of this they requested an extension of time to make the payment, and pending this matter permitted Mr. Crismon to make a tender without protest, and now rely on 'this tender as against their clients, and point to it as the act which made the option agreement effective, and thus gives them a legal right to their commission as for a completed sale. The good faith and legal effect of this pretended tender was the controlling issue in the case. It was the thing respondents relied upon, and which, if good, fixed the liability of their principals. When the good faith and effectiveness thereof was questioned by appellants, and the evidence produced by respondents thereon had cast a suspicion upon it, it devolved upon them to show by some competent evidence that Mr. Crismon had the money with which to make a valid tender. This they could have proved by showing that Mr. Crismon had credit at the bank, or that he had made some binding arrangement with the bank wherby the money was placed to his credit, and that he had a right to use it and had assumed some obligation with respect thereto. Under the facts as established, if the money had been forcibly taken from the bank clerks, it would have been the bank's money, and not Mr. Crismon's, and the bank, and not he, would have sustained the loss. The conclusion, therefore, is forced upon us that the undisputed facts and circumstances, and the inferences to be deduced from them, leave no room for doubt that Mr. Crismon was neither able nor ready, although he had been willing, to comply with the terms of his option agreement on May 1, 1906, when he was required to make the final payment; that the tender made by him is colorable merely, and this in legal effect left the whole matter as though no tender had been made; and that respondents, as the agents of appellants, in view of all the

circumstances, failed in their duty in not at once informing appellants with regard to the true situation when appellants inquired of them if the deed should be prepared for delivery.

From all it necessarily follows that the findings of the court are not sustained by the evidence, and that the conclusions of law are contrary to the law applicable to the facts. The judgment, therefore, cannot be sustained, and it accordingly, is reversed, and the cause remanded to the trial court with directions to grant a new trial, appellants to recover costs on appeal.

McCARTY, C. J., and STRAUP, J., concur.